## ELY'S ADMINISTRATOR *v.* UNITED STATES.[1]

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 27. Argued March 15, 16, 1898. — Decided May 31, 1898.

The grant which is the subject of controversy in this case was one which, at the time of the cession in 1853, was recognized by the government of Mexico as valid, and therefore is one which it is the duty of this Government to respect and enforce to the extent of one and three fourths sitios.

In *Ainsa* v. *United States*, 161 U. S. 208, it was decided, with reference to such grants, that while monuments control courses and distances, and courses and distances control quantity, where there is uncertainty in specific description, the quantity named may be of decisive weight, and necessarily is so if the intention to convey only so much and no more is plain: and this case comes within that rule.

On October 19, 1892, proceeding under section 8 of the act of March 3, 1891, c. 539, creating the Court of Private Land Claims, 26 Stat. 854, the United States filed in that court a petition against Santiago Ainsa, administrator of the estate of Frank Ely, deceased, and others, alleging that said administrator claimed to be the owner through mense conveyances of a large tract of land in the Territory of Arizona, known as the Rancho de San Jose de Sonoita; that he had not voluntarily come into the court to seek a consideration of his title; that the title was open to question, and was in fact invalid and void; that the other defendants claimed some interests in the land, and praying that they all might be brought into court and be ruled to answer the petition, set up their titles and have them settled and adjudicated.

In an amended answer the administrator set forth the nature and extent of his title, and prayed that it be inquired into and declared valid. Reply having been filed, the case came on for trial, which resulted in a decree on March 30, 1894, that the claim for confirmation of title be disallowed

---

[1] The docket title of this case is Santiago Ainsa, administrator of the estate of Frank Ely, deceased, *v.* The United States.

and rejected. The opinion by Associate Justice Sluss contains this general statement of the facts:

"On the 29th day of May, 1821, Leon Herreros presented his petition to the intendente of the provinces Sonora and Sinaloa, asking to obtain title to two sitios of land at the place known as Sonoita. The intendente referred the petition to the commander at Tubac, directing him to cause the tract to be surveyed, appraised and the proposed sale thereof to be advertised for thirty days.

"In obedience to this order the officer proceeded to make a survey of the tract, which was made on the 26th and 27th days of June, 1821, and on the completion of the survey he caused it to be appraised, the appraised value being one hundred and five dollars. Thereupon the proposed sale was advertised for thirty consecutive days by proclamation made by a crier appointed for that purpose, beginning on June 29 and ending on the 28th day of July, 1821. Thereupon, on the 31st day of July, 1821, the officer took the testimony of three witnesses to the effect that Herreros had property and means to occupy the tract. On October 20, 1821, the proceedings above mentioned being reduced to writing, were by the officer returned to the intendente.

"On October 25, 1821, the intendente referred the proceedings to the promoter fiscal for his examination.

"On November 7, 1821, the promoter fiscal reported to the intendente the regularity of the proceedings and recommending that the land be offered for sale at three public auctions, and thereupon the auctions were ordered to be held.

"The first auction was held on November 8, 1821, the second on November 9, and the third on November 10, 1821.

"At the conclusion of the third auction the land was struck off to Herreros at the appraised value by the board of auction, of which board the intendente was a member and the president.

"All these proceedings being concluded, on the 12th day of November, 1821, Herreros paid to the officers of the treasury the amount of the appraisement, together with the fees and charges required to be paid, and with his concurrence the

intendente and the auction board ordered the expediente of the proceedings to be reported to the junta superior de hacienda for its approbation, so that when approved the title might issue.

"There is no evidence that the sale was approved by the junta superior de hacienda.

"On the 15th day of May, 1825, Juan Miguel Riesgo, commissary general of the treasury, public credit and war of the Republic of Mexico for the State of the West, issued a title in the usual form purporting to convey the land to Herreros in pursuance of the proceedings above referred to and professing to act under the authority of the ordinance of the intendentes of Spain of the year 1786."

The conclusion reached was that "the entire proceedings set forth in the expediente of this title and the final title issued thereon were without warrant of law and invalid." Two of the justices dissented. Thereupon the administrator secured an order of severance and took a separate appeal to this court.

*Mr. Rochester Ford* and *Mr. James C. Carter* for appellant.

*Mr. Special Assistant Matthew G. Reynolds* for appellees. *Mr. Solicitor General* was on his brief.

MR. JUSTICE BREWER, after making the above statement, delivered the opinion of the court:

The controversy in this case does not turn upon any defect in the form of the papers. The contentions of the Government are that the officers who assumed to make the grant and to execute title papers had no authority to do so, and upon this ground it was held by the Court of Private Land Claims that the grant was in its inception invalid. Secondly, that if a valid grant was made it was one of quantity, and should be sustained for only that amount of land which was named in the granting papers and paid for by the grantee.

It appears that the proceedings to acquire title were initi-

ated by a petition to the intendant, or intendente, as he is called in the opinion of the court below, of the provinces of Sonora and Sinaloa, on May 29, 1821; that, so far as that officer was concerned, they were concluded and the sale completed on November 12, 1821. Nothing seems to have been done after this date until May 15, 1825, when the commissary general of the Republic of Mexico for the State of the West on application issued a title in the usual form. So the question is as to the power of these officers to bind the government of Mexico.

Few cases presented to this court are more perplexing than those involving Mexican grants. The changes in the governing power as well as in the form of government were so frequent, there is so much indefiniteness and lack of precision in the language of the statutes and ordinances, and the modes of procedure were in so many respects essentially different from those to which we are accustomed, that it is often quite difficult to determine whether an alleged grant was made by officers who, at the time, were authorized to act for the government, and was consummated according to the forms of procedure then recognized as essential. It was undoubtedly the duty of Congress, as it was its purpose in the various statutory enactments it has made in respect to Mexican titles, to recognize and establish every title and right which before the cession Mexico recognized as good and valid. In other words, in harmony with the rules of international law, as well as with the terms of the treaties of cession, the change of sovereignty should work no change in respect to rights and titles; that which was good before should be good after; that which the law would enforce before should be enforcible after the cession. As a rule, Congress has not specifically determined the validity of any right or title, but has committed to some judicial tribunal the duty of ascertaining what were good and valid before cession, and provided that when so determined they should be recognized and enforced.

Of course, in proceeding under any particular statute the limitations prescribed by that statute must control, and what-

ever may be the obligations resting upon the nation by virtue of the rules of international law or the terms of a treaty, the courts cannot pass beyond such limitations. In the case of *Hayes* v. *United States*, just decided, 170 U. S. 637, we called attention to the fact that in the act creating the Court of Private Land Claims there was a prohibition upon the allowance of any claim "that shall not appear to be upon a title lawfully and regularly derived from the government of Spain or Mexico, or from any of the states of the Republic of Mexico having lawful authority to make grants of land," and pointed out the difference between this statute and those construed in the *Arredondo case*, 6 Pet. 691, and the act of March 3, 1851, c. 41, 9 Stat. 631, considered in the *Peralta case*, 19 How. 343. We held that under the act of 1891 the court must be satisfied, not merely of the regularity in the form of the proceedings, but also that the official body or person assuming to make the grant was vested with authority, or that the exercise of power, if unwarranted, was subsequently lawfully ratified. We are not to presume that, because certain officials made a grant, therefore it was the act of the Mexican government and to be sustained. It must appear that the officials did have the power, and we are not justified in resting upon any legal presumption of the existence of power from the fact of its exercise.

While this is true, yet when the statutes and ordinances defining the powers and duties of an officer are somewhat indefinite and general in their terms, and that officer was in the habit of exercising the same power as was exercised in the case presented, and such exercise of power was not questioned by the authorities of Mexico, and grants purporting to have been made by him were never challenged, there is reason to believe that the true construction of the statutes or ordinances supports the existence of the power. Cases now before us disclose that about the time the intendant acted in this case similar action was taken by him in respect to other applications for the purchase of land; that through a series of years, from 1824 downward, the commissary general, the officer created by the act of September 21, 1824, recognized his acts

as creating equitable obligations on the part of the government, and attempted to consummate the sales by papers passing the legal title; that the title papers thus executed were duly placed of record in the proper office, and fail to show that subsequently thereto the Mexican government took any steps to question the title or disturb the possession. While this may not be conclusive as to the validity of the grants and the existence of the power exercised by the intendant, it certainly is persuasive, and we should not be justified in lightly concluding that he did not possess the power which he was in the habit of exercising.

What powers did the intendant possess at the time this sale is alleged to have taken place? It is conceded by the government that by the ordinance of December 4, 1786, (at which time Mexico was a province of Spain,) the intendants had full authority in reference to the sale of lands. Article 81 of that ordinance (Reynolds' Spanish and Mexican Land Laws, p. 60) is as follows:

"ART. 81. The intendants shall also be judges, with exclusive jurisdiction over all matters and questions that arise in the provinces of their districts in relation to the sale, composition and distribution of crown and seignioral lands. The holders thereof, and those who seek new grants of the same, shall set up their rights and make their applications to said intendants, who, after the matter has been duly examined into by an attorney of my royal treasury, appointed by themselves, shall take action thereon, in accordance with law, and in conjunction with their ordinary legal advisers. They shall admit appeals to the superior board of the treasury, or, should the parties in interest fail to employ that recourse, submit a report thereto, together with the original proceedings, when they consider them in condition to issue the title. The board shall, after examination thereof, return them, either for issue of title, if no correction is necessary, or, before doing so, for such other proceedings as in the opinion of the board are required, with the necessary instructions. In the meantime, and without further delay, the necessary confirmation may be made, which said superior board shall issue at the proper time, proceeding

in this matter, as also the intendants, their deputies and others, in accordance with the requirements of the royal instructions of October 15, 1754, in so far as they do not conflict with these, without losing sight of the wise provisions of the laws therein cited and of Law 9, Title XII, Book IV."

It is, however, contended that prior to the transfer of title in this case this authority was taken away from the intendant. In support of this contention four matters are referred to by counsel: 1. The adoption of the constitution of March 18, 1812, and the promulgation of the law of January 4, 1813. 2. The resolution of the council of the Indies, before a full board at Madrid, December, 23, 1818. 3. The decrees of Ferdinand VII, reëstablishing the constitution of 1812, and convoking the Cortes, March 6, 7, 9, 1820. 4. The imperial colonization law of January 4, 1823.

Of these in their order, though it may be well here to note that the colonization law was not passed until after the sale in controversy had taken place.

On March 18, 1812, in the midst of troublous times in Spain, a constitution (Reynolds, p. 79) was adopted, and by it and the law of the Cortes, of January 4, 1813, (Reynolds, p. 83,) it is insisted that a different mode of disposing of the public lands was created. As, however, this continued in force only until May 4, 1814, when the king, Ferdinand VII, returned to the throne and issued a decree refusing to recognize the existing order of things and declaring the constitution of 1812 revoked, it would seem that the powers theretofore vested in the intendants were reëstablished. Indeed, on December 28, 1814, the king issued a royal cédula or edict, the ninth article of which is as follows (2 White's New Recopilacion, p. 168):

" The governor intendants shall resume all the powers appertaining to them before the promulgation of the constitution, so called; and shall consequently exercise said powers, as well in matters of government as in those of economy and litigation relating to the royal treasury, agreeably to the laws and ordinances respecting intendants."

Clearly thereafter the intendants had the powers given

them by the ordinance of 1786.  *Sabariego* v. *Maverick,* 124 U. S. 261.

On December 23, 1818, a resolution passed by the council of the Indies, at Madrid, and approved by the king, provided that all business pertaining to the alienation of lands in New Spain should belong to the department of the office of the treasury of the Indies at Madrid.  Hall's Mexican Law, p. 76, sec. 188.  In March, 1820, Ferdinand VII, under pressure from the people, adopted the constitution of 1812 and took an oath to support it.  Did this resolution of December, 1818, or this reëstablishment of the constitution, or both together, put an end to the power of the intendants in respect to the sale of lands?  Clearly the resolution of December, 1818, would not have that effect.  The mere placing of the control over land matters in a particular government department at Madrid would in no manner affect the powers of local officers until and unless such department should so order, and there is no suggestion that any orders to that effect were ever issued.  The resolution would have no more effect on the powers of the local officers than would a transfer of the land department of this Government from the control of the Secretary of the Interior to that of the Secretary of the Treasury.  The local officers would simply have to respond to new superiors, and that is all.

Nor do we think that the reëstablishment of the Constitution even if the reëstablishment of that instrument carried with it the reënactment of the law of the Cortes of January 4, 1813, put an end to the office of intendant, or wholly abrogated his powers.  So far as the act of January 4, 1813, is concerned, while it did authorize the distribution of part of the lands on account of military service, it still provided that half of the public and crown lands should be reserved to serve as a mortgage for the payment of the national debt, and recognized the disposition of such lands by the "provincial deputation," as it was called.  Turning to the constitution we find the following provisions in chapter 2, article 324: "The political government of the provinces shall reside in the superior chief appointed by the king in each one of them."

Article 325: "In each province there shall be a deputation called provincial, to promote its prosperity, presided over by the superior chief." Article 326: "This deputation shall be composed of the president, the intendant and seven members elected in the manner that shall be stated." While it may be that under the terms of these and subsequent articles the general control over the affairs of a province was vested in the provincial deputation, of which deputation the intendant was to be one member, we find nothing in them that either put an end to the office of intendant or had any other effect than to subject his actions to the control of the provincial deputation. The question is not what the provincial deputation when organized would do, but whether the mere reëstablishment of the constitution, which provided for a provincial deputation, operated, before any action taken under it, to put an end to the powers theretofore vested in the intendants. It may well be that in thus arranging for a new system of control, without abolishing the office of intendant, but on the contrary, in terms recognizing its continuance, the purpose was not to create an interim in which no person should have power to act for the government in the alienation of its lands, but that the intendant should continue to exercise the powers he had theretofore exercised until the king should appoint a superior chief, and the other members of the deputation be elected.

The very next year witnessed the separation of Mexico from the kingdom of Spain. On February 24, 1821, a declaration of independence was made in the form known as the plan of Iguala, and this declaration of independence was made good by the surrender of the City of Mexico on September 27, 1821. The fifteenth section of this plan provided that "the junta will take care that all the revenues of departments of the state remain without any alteration whatever, and all the employés, political, ecclesiastical, civil and military, will remain in the same state in which they exist to-day."

On August 24, 1821, what is known as the treaty of Cordoba was signed at that village by General Iturbide, for Mexico, and Viceroy O'Donoju, for Spain, the latter, how-

ever, having no previous authority from Spain, and this treaty was by Spain afterwards repudiated. This treaty provided that " the provisional junta was to govern for the time being in conformity with existing laws in everything not opposed to the plan of Iguala, and until the Cortes shall form the constitution of the state." Immediately after the surrender of the City of Mexico a provisional council or junta, consisting of thirty-six members, was created under the plan of Iguala, which assumed the control of the government, and on October 5, 1821, this provisional council promulgated the following order (Reynolds, p. 95):

" The sovereign provisional council of government of the empire of Mexico, considering that from the moment it solemnly declared its independence from Spain all authority for the exercise of the administration of justice and other public functions should emanate from said empire, has seen fit to habilitate and confirm all authorities as they now are, in conformity with the plan of Iguala and the treaty of the village of Cordoba, for the purpose of legalizing the exercise of their respective functions."

That the office of intendant was one of those continued in existence by this order is clearly shown by the decree of September 21, 1824, creating the office of commissary general. (Reynolds, p. 123.) Its first two articles are:

" ART. 1. So far as concerns the federation, the officers of general and local depositories, and all revenue employés that have been retained by the federation, are discontinued.

" ART. 2. From the intendants and other discontinued officers the government shall appoint, in each state where it appears necessary, a commissary general for the different branches of the exchequer, public credit and war."

Prior thereto, and on October 24, 1821, the provisional council passed an order declaring that the office of superintendent general of the treasury was not necessary, and added, " and in consequence, has decided that the duties of the superintendency be performed, as your excellency proposed in your said report, by the directories general of the revenues, the officers of the treasury and intendants, in the

cases and matters that severally belong to them, in conformity with their ordinances, without any variation in them." (Reynolds, p. 96.) On January 16, 1822, it ordered that, "until the next august national congress fixes the system of public revenues, the intendants should remain as they are, except those who are reappointed and have, in their former offices, had a higher salary than that the intendants of Sonora and Pueblo now have." · (Reynolds, p. 98.) And on February 2, 1822, it directed that "a report of the receipts of the treasuries since independence was sworn to be forwarded by the intendancies of the empire; and a statement of the receipts and disbursements of the last fifteen days since the 24th of December." (Reynolds, p. 99.)

So that long after the sale here in question was made the government of Mexico recognized the office of intendant as continuing, and no statute or ordinance appears which in terms at least took away from that officer all control over the sales of public lands.

It is contended that the mere change of sovereignty revoked all authority to make sales of the public lands, and *United States* v. *Vallejo*, 1 Black, 541, is cited, in which it was held that the decrees of the Spanish Cortes of 1813, in relation to the disposition of the crown lands, was inapplicable to the state of things which existed in Mexico after the revolution of 1820, and could not have been continued in force there, unless expressly recognized by the Mexican congress.

And also *More* v. *Steinbach*, 127 U. S. 70, 81, in which it was observed that —

" The doctrine  . . .  that the laws of a conquered or ceded· country, except so far as they may affect the political institutions of the new sovereign, remain in force after the conquest or cession until changed by· him, does not aid their · defence. That doctrine has no application to laws authorizing the alienation of any portions of the public domain, or to officers charged under the former government with that power. No proceedings affecting the rights of the new sovereign over public property can be taken except in pursuance of his authority on the subject.".

It is doubtless true that a change of sovereignty implies a revocation of the authority vested by the prior sovereign in local officers to dispose of the public lands. And yet we think that rule is not controlling in this case, for the new sovereign made an order continuing the functions of the local officers, and one of those local officers making a sale in accordance with the provisions of the prior laws caused the money received therefrom to be paid into the treasury of the new sovereign, and that sovereign never returned the money thus received, nor challenged the validity of the sale thus made. This is not a case in which the local officers attempted to dispose of public lands in satisfaction of obligations created by the former sovereign, but one in which a sale was made for money, and that money passed into the treasury of the new sovereign.

Again, the original ordinance of intendants provided for an examination of the proceedings by "an attorney of my royal treasury." The proceedings had in this case were referred to the promoter fiscal, such being the name of the legal adviser of the treasury department, who approved them. So we have presented the case of a sale made by an officer who at one time undoubtedly had power to make a sale, who was directed by the original ordinance creating his office and establishing his powers to refer his proceedings to the legal adviser, a reference of the proceedings had by him to such legal adviser and a decision of such adviser that the proceedings were regular and that the sale ought to be consummated. Under those circumstances it is not inappropriate to refer to what was said in *Mitchel* v. *United States*, 9 Pet. 711, 742, in reference to the validity of a grant in Florida:

"It was done also on the deliberate advice of an officer responsible to the crown, which makes the presumption very strong, if not irresistible, that everything preceding it had been lawfully and rightfully done."

Again, it must be noticed that according to the report of the proceedings the money received for this land was paid into the public treasury, the entry on the account book being in these words:

"Charged one hundred and sixteen dollars, two reales and five grains paid by Don Jose Maria Serrano in the name of and as attorney for Don Leon Herreros, resident of the company of Pimas at Tubac, in the following manner: One hundred and five dollars as the principal value for which was auctioned by this intendencia one sitio and three quarters of another of lands for raising cattle contained in the place of San Jose de Sonoita, situated in the jurisdiction of said company; six dollars, one real and seven grains for the said half annual charge and eighteen per cent for transfer to Spain; two dollars, ten grains for the two per cent as a general charge, and the three dollars as dues for the extinguished account, as is explained by the order of the intendencia marked No. 32, $116 2r. 5g.

"ESCALANTE.
"FUENTE.
"JOSE MARIA SERRANO."

It would seem not unwarranted and unreasonable to refer to the familiar rule that where an agent, even without express authority makes a sale of the property of his principal, and the latter with full knowledge receives the money paid on account thereof, his retention of the purchase price is equivalent to a ratification of the sale. We do not mean, however, to state this as a general proposition controlling all municipal and governmental transactions, but only as one of the circumstances tending to strengthen the conclusion that these acts of the intendant were not mere usurpations of authority, but were in the discharge of duties and the exercise of powers conceded to belong to his office.

Passing beyond the action of the intendant, we find that in 1825 the commissary general executed title papers, thereby ratifying the sale made by the intendant four years before. We have heretofore quoted articles 1 and 2 of the act of September 21, 1824, creating such office. We now quote articles 3, 4 and 5:

"ART. 3. These commissaries shall be, in the state or states and territories of their demarcation, head officers of all

branches of the exchequer. Consequently, they are responsible for the prompt execution of the laws that govern their administration, and all employés thereof shall be subordinate to them.

"ART. 4. They shall collect and disburse, under the laws and órders of the government, the proceeds from the revenues and the contingents of the states.

"ART. 5. The revenue on powder, salt deposits, the proceeds from the revenue on tobacco that belong to the federation, national properties and vacant lands (cascos), contingents, customs, tolls and all the branches pertaining to the public credit, shall be administered directly by the commissary. The revenue on tobacco in the places where raised, that from the maritime-customs, from the mail and lotteries, shall continue under their special administration, subordinate in all respects to the commissaries."

Obviously these articles gave to this newly created officer the fullest powers in respect to the national revenues. When an office is created with such large powers as these and the incumbent thereof reviewing proceedings theretofore had by prior representatives of the government, and finding that a sale made by one of such prior officers has resulted in the payment of the cash proceeds thereof into the public treasury, confirms his action, ratifies his proceedings and issues appropriate title papers therefor, it would seem that any doubts which might hang over the power of the prior officer were put at rest, and that thereafter no question could be raised as to the validity of the sale.

And, indeed, such seems to have been the assumption on the part of the government of Mexico, for there is no suggestion that from the time of the execution of these title papers in 1825 up to the date of the cession, 1853, the government ever raised any question as to the validity of the sale or sought to disturb the possession of the grantee. While of course time does not run against the government, and no prescription, perhaps, may be affirmed in favor of the validity of this grant, yet the inaction of the government during these many years is very persuasive, not merely that it considered

that the intendant had the power to make the sale, but that in fact he did have such power. These considerations lead us to the conclusion that this grant was one which, at the time of the cession in 1853, was recognized by the government of Mexico as valid, and therefore one which it was the duty of this Government to respect and enforce.

We pass, therefore, to a consideration of the second question, and that is, the extent of the grant. It is claimed by the appellant that the grant should be sustained to the extent of the outboundaries named in the survey. He insists that the accepted rule of the common law is, that metes and bounds control area; that a survey was in fact made and possession given according to such survey, and that although it now turns out that the area within the survey is largely in excess of the amount applied and paid for, the grant must be held effective for the area within the survey.

We had occasion to examine this question in *Ainsa v. United States*, 161 U. S. 208, 229, and there said:

"So monuments control courses and distances, and courses and distances control quantity, but where there is uncertainty in specific description, the quantity named may be of decisive weight, and necessarily so if the intention to convey only so much and no more is plain."

We think this case comes within the rule thus stated. The defendant, in his answer, alleges that the grant comprises 12,147.69 acres, while counsel for the Government say that the measurements given by the surveyor make the area 22,925.87 acres. The amount of land appraised, advertised, sold and auctioned off was one and three quarter sitios (7591.61 acres). While, of course, any slight discrepancy between the area of the survey and that ostensibly sold might be ignored, yet the difference between the amount which was understood to have been sold and the amount now found to be within the limits of the survey is so great as to suggest the propriety of the application of the rule laid down in *Ainsa v. United States, supra.* There can be no doubt from the record of the proceedings that one and three quarter sitios was all that the purchaser supposed he had purchased, all

that the intendant supposed he had sold, and all that was advertised or paid for. The original petition, after stating that there was a place known as San Jose de Sonoita, declared that the petitioner registered "in the aforesaid place two sitios of land," which he desired to have surveyed, and to pay therefor the just price at which it might be valued. The petition, therefore, was not for any tract known by a given name, but for a certain amount of land in such place. The report of the survey is very suggestive. We quote from it as follows :

"In the ancient abandoned place of San Jose de Sonoita, on the 26th day of the month of June, 1821, I, the said lieutenant commander and subdelegate of the military post and company of Tubac and its jurisdiction, in order to make the survey of the land denounced by Don Leon Herreros of this vicinity, delivered to the appointed officials a well-twisted and stretched cord, and in my presence was delivered to them a castilian vara, on which cord were measured and counted fifty regulation varas, and this being done, at each were tied poles, and standing on the spot assigned by the claimant as the centre, which was in the very walls of the already mentioned Sonoita, there were measured in a northeasterly direction sixty-three cords, which ended at the foot of some low hills, a little ahead of a spring — a chain of mountains of a valley which goes on and turns to the east, where was placed a heap of stones as a monument; and being about to return to the centre, the claimant expressed a desire that the survey should be continued down the canon until the two sitios should be completed, that on each side we should survey to him only twenty-five cords, because if the survey should extend further, by reason of the broken-up condition of the country and the rocky hills in sight, such land would be useless to him, saying, at the same time, that, continuing the measurement along the canon (because it was impossible to go in any other direction on account of the roughness of the ground), by reason of the many turns that had to be made, so many cords should be deducted from the total number measured, as would be calculated to result in excess of the

real length measured, taken on a straight line, and considering
his demand reasonable I ordered the continuation of the sur-
vey as follows, to wit.

&ast;          &ast;          &ast;          &ast;          &ast;

"And in view of the suggestion made by the claimant to
reduce the number of cords actually measured so much as
might be calculated to be in fact in excess of the true
measurement by reason of the many turns of the canon over
which the survey was made, as it could not be carried on
straight, I appointed for that purpose Lieutenant Don Manuel
Leon and the citizen Don Jose Ma. Sotelo, who were unani-
mously of the opinion to deduct twenty-five cords out of the
three hundred and twelve cords measured in the last survey
down the canon, the claimant consenting thereto as just; the
survey was calculated to be two hundred and eighty-seven
cords, with which this survey was finished, resulting from it
one sitio and three fourths of another sitio, registered by Don
Leon Herreros for raising stock and for farming purposes."

The appraisers reported as follows:

"In virtue thereof they said that according to and because
of the examination they had made and being aware of the ex-
isting regulations on the subject, the price should be fixed at,
and they fixed it at, sixty dollars for each sitio, because they
have running water and several banks of arable land which
can be made use of by cultivation."

The direction for the almoneda or offer of sale was of the
lands "composed of one sitio and three fourths of another."
The first almoneda was of lands "comprising one sitio and
three fourths of another,  .   .   .   and appraised in the sum of
one hundred and five dollars, at the rate of sixty dollars per
sitio."   The property put up for sale was lands "comprising one
sitio and three fourths of another,  .   .   .   appraised at one
hundred and five dollars, at the rate of sixty dollars each sitio."
The report of the promoter fiscal opens with this statement:

"The promoter fiscal of this treasury has examined care-
fully the expediente of the lands surveyed in favor of Don
Leon Herreros, resident of the military post of Tubac, by the
Commissioner Don Elias Ygnacio Gonzales, lieutenant com-

mander of the post, in the place called San Jose de Sonoita, in that jurisdiction, from which resulted one sitio and three fourths of another, for raising stock and horses, valued at sixty dollars each sitio, which sums up one hundred and five dollars, as it has running water and some pieces of land fit for cultivation."

Subsequently to this report the direction was made for three public auctions, which were made, and the record of the first auction, the others being similar, is in these words :

" 1st auction.   At the city of Arizpe, on the 8th day of the month of November, 1821, there convened as a board of auction the intendente as president and the members composing the board, in order to make the first auction of the lands referred to in this expediente.   They caused many persons to collect by the beating of drums at the office of the intendencia, and in their presence they made the crier, Loreto Salcido, announce, as he did in a loud and clear voice, saying: ' There is to be auctioned at this board of auction one sitio and three fourths of another of public lands, for raising cattle, comprised in the place of San Jose de Sonoita, in the jurisdiction of the military post of Tubac, surveyed in favor of Don Leon Herreros, resident of the same, and appraised in the sum of one hundred and five dollars, at the rate of sixty dollars per sitio; whoever wants to make a bid on it, let him do so before this board, which will admit it if done properly; with the understanding that at the third and last auction, which will take place the day after to-morrow, the property will be sold to the highest bidder.' "

The payment was, as appears from the entry in the treasury office, heretofore quoted, of "one hundred and five dollars as the principal value for which was auctioned by this intendencia one sitio and three quarters of another of lands for raising cattle, contained in the place of San Jose de Sonoita." So, notwithstanding the fact that as shown by the report of the surveyors, a survey was made, all the proceedings from the commencement to the close contemplated, not the purchase of a given tract of land, but a certain amount of land in the place of San Jose de Sonoita.   Every consideration of equity,

therefore, demands that the title of the purchaser should be confined to the one and three fourths sitios for which he paid.

As indicated in *Ainsa* v. *United States, supra,* too much stress cannot be laid on the technical rules of the common law in reference to the dominance of courses and distances over area. It is a matter of common knowledge that in this part of the country large areas beyond the immediate reach of water courses or springs were arid; that purchases were of lands so watered or so susceptible of watering that crops could be expected therefrom, or pasturage furnished for stock. The land beyond the reach of these water supplies was deemed of little value, and hence slight attention was paid to it. Every purchase therefore must be considered as dominated by this important and single fact. Rude methods of measurement were resorted to. As shown in the report of the survey in this case mere estimates were relied upon. Doubtless this carelessness was partly owing to the fact disclosed in *Ainsa* v. *United States,* that any overplus above the actual amount paid for still remained the property of the government, payment for which could be compelled of the locator, or, on his failure to make such payment, could be appropriated by any third party desiring to purchase. The fact that during these years no challenge was made of the overplus is not important. The government was indifferent. Its rights could be enforced at its leisure, and no individual cared to purchase any surplus of arid lands. The presumption which might obtain in other places from the inaction of the government, the failure of any individual to assert a claim to the overplus, is in respect to the lands in this territory of no significance. Who there would care to question the right of a locator along a waterway to any overplus of arid lands? Such overplus was of no value, and no third party would ever care to challenge the locator's right to this overplus, and the government, like the individual, was also indifferent. So the silence and inaction of the government and third parties are not strange, and create no presumption in favor of the validity of the grant to the extent of the survey.

Sustaining the validity of the grant to the extent of the

land paid for is but carrying out the spirit of the treaty, the obligations of international justice and the duties imposed by the act creating the Court of Private Land Claims.   Article 8 of the treaty of Guadalupe Hidalgo provided in reference to the ceded territory that "Mexicans now established in territories previously belonging to Mexico, and which remain for the future within the limits of the United States, as defined by the present treaty, shall be free to continue where they now reside, or to remove at any time to the Mexican republic, retaining the property which they possess in the said territories, or disposing thereof, and removing the proceeds wherever they please, without their being subjected, on this account, to any contribution, tax or charge whatever," and that "in the said territories, property of every kind, now belonging to Mexicans not established there, shall be inviolably respected " 9 Stat. 929 ; and these stipulations were reaffirmed in Article 5 of the Gadsden treaty.   10 Stat. 1035.   Article 6 of that treaty, which placed a limitation, provided " that no grants of land within the territory ceded . . . will be considered valid or be recognized by the United States, or will any grants made previously be respected or be considered as obligatory, which have not been located and duly recorded in the archives of Mexico."   But this limitation is not to be understood as denying the obligations imposed by the rules of international law in the case of cession of territory, but simply as defining specifically the evidences of title which are to be recognized. The spirit of the treaty is fully carried out when the amount of land petitioned and paid for is secured to the grantee or his successors in interest.   This Government promised to inviolably respect the property of Mexicans.   That means the property as it then was, and does not imply any addition to it.   The cession did not increase rights.   That which was beyond challenge before remained so after.   That which was subject to challenge before did not become a vested right after.   No duty rests on this Government to recognize the validity of a grant to any area of greater extent than was recognized by the government of Mexico.   If that government had a right, as we have seen in *Ainsa* v. *United States*

it had, to compel payment for an overplus or resell such over-plus to a third party, then this Government is under no moral or legal obligations to consider such overplus as granted, but may justly and equitably treat the grant as limited to the area purchased and paid for.

It may be said that to consider the tract granted as one not extending to the limits of the outboundaries of the survey is to hold that the tract granted was not located, and therefore within the terms of the Gadsden treaty, not to be recognized by this Government, as suggested in *Ainsa* v. *United States.* In that case it appeared that while the outboundaries of the survey extended into the territory ceded by Mexico to the United States, the grantee had taken and was in possession of land still remaining within the limits of Mexico, to the full extent which he had purchased and paid for, and therefore no legal or equitable claim existed against the United States in reference to land within the ceded territory.

It is also undoubtedly true, as disclosed in that case, that where there is a mere grant of a certain number of acres within specified outboundaries there may be such indefinite-ness as to prevent a court from declaring the true location of the granted lands. And yet it is also true that there may be disclosed by the survey or other proceedings that which will enable a court of equity to determine with reasonable certainty what lands were intended to be granted and the title to which should be established. It must be remembered in this connec-tion that by section 7 of the act creating the Court of Private Land Claims, it is provided " that all proceedings subsequent to the filing of said petition shall be conducted as near as may be according to the practice of the courts of equity of the United States." Therefore in an investigation of this kind that court is not limited to the dry, technical rules of a court of law, but may inquire and establish that which equitably was the land granted by the government of Mexico. It was doubtless the purpose of Congress, by this enactment, to pro-vide a tribunal which should examine all claims and titles, and that should, so far as was practicable in conformance with equi-table rules, finally settle and determine the rights of all claim-

ants. It will be unnecessarily limiting its powers to hold that it can act only when the grant to the full outboundaries of the survey is valid and is powerless when a tract within those outboundaries was granted. Many things may exist by which the real tract granted can be established. In the case before us, if it be possible to locate the central point from which according to the report the survey was made (and we judge from the testimony that it is possible) the actual grant can be established by reducing each measurement therefrom to such an extent as to make the area that of the tract purchased and paid for. If the outboundaries disclose a square or any rectangular figure, the excess of area suggests simply a carelessness of measurement, and can be corrected by a proportionate reduction in each direction. In other cases, the location of the waterway, the configuration of the ground, may be such as to enable a court of equity by its commissioner or master to determine exactly what was intended to pass under the grant. We do not mean to anticipate all the questions that may arise. We simply hold that the mere fact that the grant is narrower than the limits of the outboundaries does not prevent the Court of Private Land Claims from determining through the aid of a commissioner, surveyor or master exactly what equitably did pass under the grant. It is enough for this case to hold that the powers of the Court of Private Land Claims are not narrow and restricted, and that, when it finds that there is a valid grant for a certain number of acres within the outboundaries of a larger tract, it may inquire, and, if it finds sufficient reasons for determining the true boundaries of the tract that was granted, it can so prescribe them, and sustain the claim to that extent, referring to the Land Department the final and absolute surveys thereof.

*In view of these considerations, we are of opinion that this grant should be sustained to the amount of one and three fourths sitios, and the judgment of the Court of Private Land Claims is reversed and the case remanded to that tribunal, with directions to examine and decide whether there be sufficient facts to enable it to determine the true boundaries of the one and three fourths sitios.*