# RELOJ CATTLE COMPANY v. UNITED STATES.

## APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 30. Argued and submitted October 21, 1901.—Decided March 17, 1902.

*Ainsa* v. *United States*, 161 U. S. 208, reaffirmed.

The grant asked to be confirmed was a grant by quantity according to the laws when it was made.

As the lawful area of the grant was south of the boundary line between the United States and Mexico, there could be no confirmation in this country, and moreover, the owners had obtained full satisfaction thereof from Mexico before this petition was filed, and no legal or equitable claim therefor existed against the United States.

Claims for *demasias* or overplus, in respect of which the conditions were unfulfilled, are imperfect claims, and such a claim as set up in this case was barred by limitation.

THE Reloj Cattle Company, claiming to be the owner in fee of a tract of land in the county of Cochise, Arizona, which it described as the San Pedro grant, filed its petition for confirmation in the Court of Private Land Claims, May 29, 1897. The petition alleged that the grant contained 37,000 acres in the United States, and, by a sketch map attached, 19,000 acres in the Republic of Mexico, or a total of 56,000 acres, within its exterior boundaries. It gave a description of the grant by courses and distances from certain natural objects, and relied on a survey made by one Howe. The petition further alleged that plaintiff was the owner of the tract by virtue of certain instruments in writing, by which it had acquired from Rafael Elias, the original grantee, title to all the property he had therein; that the grant title bore date May 2, 1833, and was duly made, executed and delivered by Don José Maria Mendoza, treasurer general of the State of Sonora, in the name of that State, under and by virtue of article 11 of the general

sovereign decree No. 70, passed August 4, 1824, by the sovereign constituent congress of the United States of Mexico, which article conceded to all of the States of the Republic the rents or revenues which by said law were not reserved to the general government, one of which revenues was the vacant lands within the States of the Republic, thereby confirming to the States the lands so described.

It was further averred that by law No. 30 of May 20, 1825, and other decrees subsequent thereto, the constituent congress of the State of Sonora and Sinaloa prescribed regulations for the sale of such lands; that the initiatory proceeding to obtain the grant title to the lands in question was by petition dated 1820 or 1821, addressed to the governor intendente, the officer of the Spanish government in charge of and having exclusive jurisdiction in the matter of the sales of public lands in the precinct of Fronteras, in which precinct the lands petitioned for were situated, which petition was made and signed by José Jesus Perez, and proceedings thereon taken as required by the applicable royal ordinances of December 4, 1786; that thereafter, on July 5, 1822, at Arispe, Sonora, the tract petitioned for was sold by the proper officers to Perez for the sum of $190; that on July 6 the intendente ordered Perez to pay into the treasury that sum, together with costs and charges; that on July 7 the sale was approved by the provincial imperial treasury at Arispe, and was referred to the superior board of the treasury for its approval or determination, and that thereafter the $190, together with costs and charges, was paid into the national treasury of the Republic of Mexico; but that the superior board of the treasury was abolished before the sale was approved, and no further action was taken until October 25, 1832, when proceedings were instituted to transfer the rights and title of Perez to Rafael Elias, and to have the formal title to the lands issue to Elias; that in accordance therewith, on May 8, 1833, José Maria Mendoza, the treasurer general of the State of Sonora, issued to Elias the final testimonia or evidence of title to the grant, which was thereupon duly recorded in the proper records of Sonora.

The petition alleged that the claim was presented by certain

grantors of petitioner to the surveyor general of Arizona, and a report made by a duly authorized agent of the United States to the effect that the expediente was among the archives in the State of Sonora, and that all the proceedings were regular, and the certificates showing payment and the record of the transfer between Perez and Elias were properly recorded, and in the proper place, among the archives of Sonora; that there was on file in the office of the surveyor general of Arizona a report of one Wharton, apparently acting under special instructions of the Commissioner of the General Land Office, in which he reported against the land grant, and that the land described therein was situated in the State of Sonora, Mexico, but the petition charged that the report was not made with full knowledge of the facts; and also that there was a report on file by one Borton, apparently acting under instructions of the surveyor general of Arizona, of an indefinite character. And it was alleged that beyond what was so stated the San Pedro grant had not been acted on by Congress, or any other competent authority of the United States, constituted by law for the adjustment of land titles within the Territory of Arizona.

The petition averred that all the proceedings in the matter of the grant were regular, complete and legal, and vested a perfect and valid title in fee thereto in the grantee; that the grantee went into actual possession and erected proper monuments, and that the grantee and his descendants and legal representatives and assigns have continued until the present time in the actual possession, use and occupation of the same, and were seized and possessed in fee thereof; that petitioner was entitled to all of the lands embraced within the original survey of the grant lying in the Territory of Arizona, and that they were the lands delineated on the map filed with the petition; and that there was no person in possession of the grant otherwise than by permission of petitioner, except one Roberts, who was made a defendant. On May 13, 1899, plaintiff filed an amended petition in which the description followed an amended map and survey made by one Contzen, and attached to the amended petition, which survey was the one relied on at the trial, and made the contents of the grant within the United States 38,622.06 acres.

The answer of the United States denied the correctness of the surveys and maps of Howe and of Contzen, and alleged that the tract, whether located according to quantity, or courses and distances, or natural objects, was situated entirely south of the boundary line between the Republics of the United States and Mexico, and without the jurisdiction of the court.

The answer further denied that the claim set forth was at the date of the treaty a complete and perfect title, and pleaded the statute, whereby all imperfect claims not filed within two years from March 3, 1891, became forever barred.

The answer also set up that under and pursuant to proceedings of denouncement, commenced in July, 1880, by the predecessors of the Reloj Cattle Company, the government of Mexico measured off and delineated to said persons the legal area or *cabida legal* of four sitios mentioned in claimant's title papers; and in the same proceedings it was adjudged that the ranch of San Pedro had no known boundary, and thus no surplus or *demasias ;* that the four sitios were measured off and delineated to said persons by the Mexican government and located entirely within the Republic of Mexico; and that the claim sued for was thus entirely satisfied and discharged by the location of the said four sitios within the Republic of Mexico.

The case came on for hearing in June, 1899, at which time there was offered in evidence for plaintiff a copy of the original expediente of the San Pedro grant, from which it appeared that in the year 1821 one José Jesus Perez presented the following petition to the governor intendente :

"I, Don José de Jesus Perez, a resident of this capital, before your excellency, in conformity with law, and in accordance with the royal ordinances concerning land, laws, sanctions, and rescripts that treat of the royal and abbatial lands with which His Majesty (God perserve him) protects his vassals, as perquisites of his royal patrimony, appear and state : That, whereas I enjoy some property, acquired in the military service and by my own industry, without owning a place upon which to locate and bring them together (centruarlos), I apply to the superior authority of your excellency (with prior permission of my father) in order that, pursuant to the provisions of the national

laws and the terms of the royal cedula of February 14, 1805, the depopulated place down the San Pedro River, situate in this province, toward the north, on the hostile frontier, close to the adandoned place of Las Nutrias, be considered as registered, in virtue of which I protest that I will enter into composition with His Majesty (God preserve him) and will pay the quota or cost of its purchase, the royal half annate tax, and whatever else may be necessary, for such is rigorous justice with relation to what is stated. In this understanding I pray you to issue commission for the execution of the necessary proceeding, ocular examination, reconnoissance of the ground, survey, appraisement, publication, possession, and final sale of the four sitios, which will be surveyed for me in a square or oblong figure, according to the length or extent of the land and its direction, and in these terms I pray your excellency to defer to my just petition, by which I shall receive grace. I protest costs and whatever is necessary, etc."

March 12, 1821, this petition was referred by the governor intendente for survey, appraisement and other customary proceedings, and for citation to the adjoining owners, with instructions to return the proceedings, when completed, for further action. On May 3, 1821, a promotor fiscal, appraisers and recorder of courses were appointed by the constitutional alcalde of the district and judge surveyor of that registry, who accepted their positions, took the proper oaths, and were duly commissioned. On the same day publication of notice was had to all whose rights might be affected to appear at the house of San Pedro, the place of the proposed purchase; in response to which one Antunes of the place of Terrenate, claiming certain sitios in the vicinity, appeared and objected that if the survey went up the river, or south, (the river ran north,) from the house of San Pedro, it would interfere with his rights, to which Perez's attorney objected, on the ground that if the survey went down the river, or north, it would deprive Perez of the benefit of the water from the marsh, which was the mother of those pastures. The matter was compromised by an agreement to divide the water of the marsh. This part of the expediente is of importance in respect of the contention that the

entire grant was south of the boundary line between the United States and Mexico, and as to the starting point of the primitive survey.

The survey was then proceeded with from the place of San Pedro, and is set forth at length, and, having been concluded, the alcalde May 21, 1821, directed that an appraisement and valuation be made by the appraisers previously appointed, who appraised the first three sitios at $60 each, and the remaining one at $10. Thereupon the alcalde, reciting that the "four sitios of land for live stock" had been appraised and valued, required the proceedings to be forwarded to the promotor fiscal for him to deduce, according to their condition, what he considered proper to the benefit of the public treasury. May 22, the fiscal directed the alcalde to make inquiry as to whether Perez had the qualifications required by law, and whether he had sufficient property to protect these sitios, and finally whether great advantage would result to the public treasury by their protection and settlement. Testimony was taken, and, the result of the inquiry being satisfactory to the fiscal, he directed, May 26, the publication for thirty days consecutively of the appraisement of said lands, and provided for bids thereon, and that the final sale and disposition of the land should be at Arispe, before the provincial board of the royal treasury, presided over by the governor intendente of the province. Publication was thereupon had, the first being as follows:

"On said day, month, and year, I, the judge surveyor, caused Lazaro Quijada, at the sound of the drum and in a clear, loud, and distinct voice, to announce: It is made public and notorious that Don José Jesus Perez has registered the place of San Pedro, and, his petition being admitted, there were measured and located and sold four sitios of land for large stock, which were appraised and valued in the sum of one hundred and ninety dollars, in virtue of which every one who believes he has a well-founded right or desires to make a bid for the land mentioned may apply, as his bid will be admitted and his actions reserved till the day of the disposition and sale, which will be in Arispe on the day designated by the governor intendente of the prov-

ince, to which end his actions and rights are reserved. And no bidder having appeared I entered it as a minute, which I signed, with those in my attendance, according to law, as I certify, and on this paper, without prejudice to the royal revenue."

The proclamations took place for thirty consecutive days, and no one appearing to outbid Perez, the alcalde and judge surveyor, June 26, 1821, transmitted to Antonio Cordero, the governor intendente, " the proceedings of survey, ocular inspection, appraisements, and publications executed on the depopulated tract of San Pedro in favor of Don José Jesú Peréz, for your excellency to make such order as may be just." The proceedings were referred to the promotor fiscal, and June 25, 1822, he reported favorably thereon, and recommended that the celebration of the three customary offers be proceeded with in the capital of the intendency, the city of Arispe, in solicitation of bidders for the final sale of said land. On July 3, 1822, this was ordered, and such offers were made July 3, 4 and 5, 1822, at Arispe. The land described in the first offer was " four sitios of royal land for raising cattle comprised in the place called San Pedro, situate in the particular territory of the presidio of Fronteras, surveyed for Don José Jesú Peréz, of this city, and appraised in the sum of $190 at the rate of $60 for the first three and $10 for the other one."

The final offer of sale was as follows :

" In the city of Arispe, on the 5th day of the month of July, 1822, having assembled as a board of sale in this said capital, the intendente, as president, and the members who compose it, for the purpose of making the third and last offer of the lands to which these proceedings refer, they caused many individuals to assemble, at the sound of the drum and the voice of the public crier, in the office of this intendency and Loreto Salcido to proceed to make in their presence a publication, as he in effect did, similar in all respects to the one set out in the preceding offer, with only the difference of announcing to the public that the final sale is now to be made to the highest and best bidder. In which act appeared Don José Maria Serrano, as attorney of Don José Jesus Perez, again offering the value of the land, and the hour for midday prayer of this day having

already been struck, the public crier finally said: '.Once, twice, three times; sold, sold, sold; may they do good, good, good, to Don José Jesú Peréz.' In these terms this act was concluded, the four sitios of royal land referred to in these proceedings being solemnly sold in favor of this party in interest for the sum of one hundred and ninety dollars, and in due witness thereof this minute was entered with the president and members of this board of sales, signed with the attorney, Don José Maria Serrano."

Thereupon the attorney of Perez prayed that " when the approval of the superior board of the treasury is obtained, there may be issued in favor of my party the corresponding title of grant and confirmation of the four sitios which said land contains, being prompt to appoint in Mexico a person under pay and expenses to be charged with managing the present matter at that court." July 6, 1822, the intendente *ad interim*, Bustamente, admitted Perez to composition with the imperial treasury for said royal land, and ordered that his attorney be notified to pay into the treasury the sum of two hundred and eight dollars, one grain; one hundred and ninety "as the principal value at which there were sold to said party in interest, the four sitios which said tract comprises;" and the remainder taxes and expenses. The provincial board of the imperial treasury approved the sale in favor of Perez the next day, describing the land as being " the four sitios of royal land for raising large stock which the place called San Pedro comprises." July 8, the sum of two hundred and eight dollars, one grain, was paid into the treasury at Arispe. No action appears to have been taken in the matter by the superior board of the treasury, and it remained as it was until October 25, 1832, when Ignacio Perez, on behalf of his brother José Jesú Peréz, presented to the treasurer general of the State of Sonora a petition alleging that on July 5, 1832, there was sold in favor of his brother " the land called San Pedro, situated in the jurisdiction of Fronteras, including four sitios of land," and that he had lawfully exchanged the right he had thereto with citizen Rafael Elias, and requesting that inasmuch as the corresponding title to the land had not yet been issued, he might be pleased to order that title

issue to said citizen Rafael Elias "as the actual owner and proprietor of the land of. San Pedro." On that day the treasurer general transmitted to the governor of Sonora the proceedings "comprehensive of the registry, survey, appraisement, publications, and sale of four sitios of land, at the place called down the San Pedro River, in favor of citizen José de Jesus Perez;" that Perez had paid into the treasury "the sum of two hundred and eight dollars, one·grain, for the principal value of the land and its corresponding taxes;" and that Perez desired the title to be issued to Rafael Elias, complying at the same time with article 27 of law No. 30 of May 20, 1825; and the treasurer reported that he considered the proceedings sufficient. October 31, 1832, Ignacio Bustamente, governor of Sonora, returned the proceedings with this communication: "Having examined the proceeding on the lands which your excellency transmits with your note of the 25th ultimo, comprehensive of four sitios surveyed at the place called down the San Pedro River, in favor of Don José Jesú Peréz, I returned it to your excellency for your excellency to issue to Don Rafael. Elias a corresponding title for the grant, in view of the exchange Don Ignacio Perez of this place has made with him." Mendoza, thereupon, May 8, 1833, issued the· grant, reciting: "Whereupon, in the exercise of the powers which the laws confer upon me, by these presents and in the name of the sovereign State of Sonora, I confer the grant in the form of four sitios of land for breeding large cattle and horses, which comprise the place named San Pedro, situate in the jurisdiction of the presidio of Santa Cruz, in favor of the citizen Rafael· Elias, to whom I grant, give, and adjudicate these lands by way of· sale, with all the privileges, guaranties, and stability which the laws provide, etc." And commanded that the officials "do not permit that the said interested party nor his successors be in any· manner disturbed in their peaceful enjoyment, nor molested in the free use, exercise, proprietorship, dominion, and possession of the said four sitios of land which comprise the place named San Pedro."

In the proceeding for the denouncement of the overplus of the ranch of San Pedro subsequently had in Mexico, it is recited that the district judge ".has before him the testimonio of

the title of the grant of four sitios of land for raising large stock issued by the citizen treasurer general of the State in the city of Arispe under date of 8th of May of the year 1833, José Manuel Mendoza, in favor of citizen Rafael Elias, and after payment of two hundred and eight dollars, one grain, which said Elias paid into the funds of said treasury as the value of the four sitios, expenses and fees of the title. The land is generally known by the name of ranch of San Pedro, in the jurisdiction of the town of Santa Cruz and near the presidio of Fronteras in the district of Magdalena." Plaintiff also introduced in evidence a copy of the titulo to the San Rafael del Valle grant. Oral evidence was introduced on both sides in respect of the original and subsequent surveys.

The government introduced a petition of the Eliases presented to the surveyor general, together with a map attached to such petition. The government also introduced the expediente of the proceedings of denouncement of the *demasias* of the ranch of San Pedro commenced July 8, 1880, on behalf of the Elias family. On that day Manuel Elias made a formal denouncement " of the overplus that may be in the ranch of San Pedro in the jurisdiction of the town of Santa Cruz in the district of Magdalena," of which ranch he alleged that he was a coöwner. After considerable delays and after securing by appeal a declaration of his right to proceed to such denouncement, Elias on June 1, 1882, secured the appointment of one Pedro Molera, who was directed to "proceed to the resurvey of the ranch of San Pedro, after examination of its titles and citation of adjoining owners, marking on the ground as well as on the respective maps the lawful area (*cabida legal*) of said ranch and the overplus, (*demasias*), it may contain within its monuments, subjecting his operations to the general laws of July 22 and August 2, 1863." Molera accepted the appointment, and, July 19, 1882, appeared at the ranch of San Pedro. His report recited that before proceeding with the survey he found it necessary to make a reconnoissance of the land because the titles were decidedly obscure; and notwithstanding the person who made the ancient survey gave the distances, the courses were incomprehensible, and no description was

given of the places the title cited. He then set forth what he did in respect of the general lines on which the grant should be located, and proceeded to lay off the *cabida total*, or entire area, within the exterior boundaries, so far as he could ascertain them. Having laid off the total area of 28,265.11 hectares running up to the international line on the north, Molera on July 28, 1882, proceeded to segregate the legal area (*cabida legal*), which was for four square leagues. He described the methods he adopted, and from the map and field notes it appeared that the legal area was 7061.61 hectares, which, deducted from the total area, left an overplus or *demasias* of 21,203.47 hectares. Orders were then given for the advertisement of the proceedings, and testimony was taken as to the qualifications of Elias to secure the property. In April, 1884, the district judge at Guaymas recited that it appeared that the ranch of San Pedro belonged to various owners, who under the law had equal rights to the *demasias*, and ordered that Manuel Elias be notified to state whether or not he consented that said *demasias* should be adjudged to him in company with the other owners, and thereupon it was consented that the *demasias* should be adjudged to all the owners. November 18, 1884, the value of the *demasias* was fixed, but no price was fixed for the *cabida legal*, since that part of the survey belonged to the original parties. The order of the district judge recites that having examined the proceedings of survey and the map, both made by the surveyor, Pedro Molera, from which it appears that there is a total area of 28,265.11 hectares, of which 7061.64 hectares are covered by title and 21,203.47 hectares are *demasias*, and, having examined the other proceedings, decreed the adjudication of said overplus to José Maria, Manuel and the heirs of José Juan Elias in third parts, subject to the approval of the department of public works. The proceedings were transmitted to that department at Mexico, and an error having been found in the calculations were returned with orders to the surveyor to repeat the survey and correct the error. Molera again went into the field, and on March 19, 1887, made a recalculation of the *cabida total*, with the result that the overplus was found to be 21,231 hectares and a fraction instead of 21,203 and a fraction.

The correct valuation was thereupon made and the proceedings again sent to Mexico.   May 3, 1887, the department of public works recited that they had examined the survey of the so-called *demasias*, and observed that on such survey "no monuments were found that would determine the limits or boundaries of said ranch," and that the courses indicated in the primitive survey were so confusing that in "attempting to follow them one goes and returns repeatedly over the same line without it being possible to circumscribe with this data any perimeter whatever." It was accordingly found and ordered that the ranch of San Pedro had no known boundary or boundaries that could be determined, and consequently had no *demasias*, so that the land denounced was not *demasias*, but vacant public land; and that Molera made an arbitrary survey.   The adjudication was therefore not approved, and the office of the chief of the treasury in the State of Sonora was directed to register the land and the public treasurer to enter into possession of it, except that part which had been sold to McManus & Sons, and for which the proper title had already been issued.   This order was subsequently revoked as a matter of equity, and the purchase of the property allowed so far as not conflicting with the McManus grant.   On July 4, 1887, on the petition of Elias, one Bonillas was appointed surveyor for the purpose of separating the Mc-Manus land from the land sought by Elias, and to make a report that would enable the final purchase of the balance by Elias's family to be effected.   This survey gave the total area of the San Pedro ranch, after cutting off the McManus land, as 22,058 hectares, 11 ares, 8 centiares, from which subtracting the legal area (*cabida legal*) of 7022 hectares, 44 ares, there remains an overplus of 15,035 hectares, 67 ares, 8 centiares. (Hectare=2.471 acres.)   February 24, 1888, the President of the Republic approved the adjudication of this overplus in favor of Elias and associates, and ordered the proper title to issue to them upon payment of the required amount.   The proper amount was paid, and on October 15, 1888, Alejandro Elias, for the Elias heirs, receipted for the title of said *demasias*, issued by President Diaz, February 24, 1888.

The government also introduced in evidence the expediente

of an adverse suit brought by Plutarco Elias respecting himself and his mother and brothers on the denouncement of the overplus of the Agua Priete grant made by Camou Brothers, in which, in deciding the matter, the district judge recited that the fact that the Elias family had already denounced a large area of *demasias* in the Republic of Mexico, and mentioned many other tracts denounced by them besides the overplus of the San Pedro ranch, and called attention to the fact that the Eliases in consequence of such denouncements had secured a larger grant than they were allowed to obtain under the law of July 22, 1863. He quoted from the regulations of the department of public works in which the method of acquiring *demasias* and other vacant lands is set forth, and showed from the order of the department of public works that overplus within a grant rests on exactly the same basis as other public lands, except that under the provisions of the law of July 22, 1863, a preference in its purchase is given the owner of the legal area. The district judge held that the Elias family had no right to be admitted as denouncers since they had already obtained an area greater than that designated by law.

The Reloj Cattle Company was incorporated September 24, 1885, and various quitclaims of the interests of the Elias heirs in eighteen thousand acres in the grant, described as being north of the boundary line, commencing with April 2, 1883, and down to October 13, 1885, were introduced by it as muniments of title. The cause was submitted June 2, 1899, and November 27, 1899, the court entered a decree rejecting the grant and dismissing the petition. The court held that the grant was one of four sitios only, and that the owners had secured full satisfaction from the Mexican government and within its territory of all that they were entitled to. Thereupon this appeal was prosecuted.

*Mr. H. H. Cobb* for appellant. *Mr. Rochester Ford* filed a brief for same.

*Mr. Solicitor General, Mr. Matthew G. Reynolds* and *Mr. William H. Pope* for the United States, submitted on their brief.

MR. CHIEF JUSTICE FULLER delivered the opinion of the court.

Perez petitioned for the grant " pursuant to the provisions of the national laws and the terms of the royal cedula of February 14, 1805."

That cedula provided that, (for the reason " that the settlement of a *sitio* of a league in extent was very difficult for a person of large means, and that lands of large area were held without this legal obligation having been fulfilled to the prejudice of others,") " there should not be adjudicated nor granted more than three or four tracts (to the wealthy), and two to the poor; " " with the understanding that the lowest estimate was not to be less than ten dollars for lands without water, thirty for lands irrigable by means of wells, and sixty for those capable of regular irrigation." Reynolds, p. 72. Recognizing the limitation, Perez prayed for the sale to him of " *the* four sitios."

The entire proceedings were directed to the acquisition of four sitios. Four sitios were valued; four sitios were put up at the auctions; four sitios were purchased; four sitios were paid for; and four sitios were granted. The intention to convey only so much and no more is plain, and is controlling. The title of the grantee was limited to that quantity. *Ainsa* v. *United States*, 161 U. S. 208; *Ely's Administrator* v. *United States*, 171 U. S. 220; *United States* v. *Maish*, 171 U. S. 277; *Perrin* v. *United States*, 171 U. S. 292.

The *cabida legal*, or lawful area, was, therefore, four sitios or something over seventeen thousand three hundred and fifty acres, and this lawful area, " *the* four sitios," was described by Perez as " the depopulated place down the San Pedro River, situate in this province, toward the north, on the hostile frontier, close to the abandoned place of Las Nutrias."

The primitive survey was at the place of San Pedro, and Las Nutrias was two or three miles to the southwest. It is plain that the old house of San Pedro was in existence at that time. When Antunes appeared from the place of Terrenate, which was a short distance west of the house of San Pedro, he was willing that the survey should proceed " from the house of San Pedro down the river," (the river ran north or somewhat east

of north,) while Perez claimed it should be located up the river to get the benefit of the water of the marsh. This dispute was compromised by agreeing to divide the water of the marsh, which lay some distance above the house of San Pedro. The starting point of the survey was plainly up the river from the house, and then the line ran below it, for the survey states : "I caused a monument to be placed at a rectangular corner, from which, taking the course southwest to northwest, there were measured and counted fifty cords, the last of which terminated down the river from the house, on the edge of the ford, on the bank." That the house of San Pedro was an important call in the location of the grant on the ground is unquestionable. That house was the ancestral home of the Elias family, and on that place some of its members still reside. It was and is in Mexico, several miles south of the boundary line. Accordingly when Manuel Elias made a formal denouncement, July 8, 1880, of the *demasias* there might be in the ranch of San Pedro, and it became necessary to mark the *cabida legal* on the ground, the Mexican authorities laid off the four sitios so as to embrace the San Pedro settlement. The omission of San Pedro from the lawful area of the San Pedro grant would have, indeed, been something remarkable. The owners of the grant thus obtained from Mexico full satisfaction of its *cabida legal*, and no legal or equitable claim therefor existed against the United States when this petition was filed.

In *Ainsa* v. *United States*, 161 U. S. 234, it was said : "We have referred to the proceedings of 1882, 1886, in Mexico, as furnishing persuasive evidence of the proper construction of this grant under Mexican law, and it may be further observed that the adjudication of the overplus required the location of the $7\frac{1}{2}$ sitios, which location Mexico, as the granting government, assumed it had the right to make, and made out of the land within its jurisdiction. In this way the grant was satisfied by the receipt of all the grantees had bought and were entitled to under the Mexican law, the result as to the overplus inuring to Camou's cotenants by the terms of his petition."

In *Ely's Administrator* v. *United States*, 171 U. S. 220, the court, referring to *Ainsa's* case, observed : " In that case it ap-

peared that while the boundaries of the survey extended into the territory ceded by Mexico to the United States, the grantee had taken and was in possession of land still remaining within the limits of Mexico to the full extent which he had purchased and paid for, and therefore no legal or equitable claim existed against the United States in reference to the land within the ceded territory." It is quite impossible to entertain the proposition that the Court of Private Land Claims should have adjudged to appellants another *cabida legal* on this side of the boundary line. According to the doctrine of *Ely's* case no different location could have been recognized if the entire area had been in this country.

Something is said in respect of the right to confirmation of the tract sued for treated as *demasias.* But, apart from other insuperable objections to that suggestion, such a claim would be imperfect for want of fulfillment of conditions, and barred by section 12 of the act of March 3, 1891.

*Decree affirmed.*