## AINSA *v.* UNITED STATES.

### APPEAL FROM THE COURT OF PRIVATE LAND CLAIMS.

No. 40. Argued January 29, 1902.—Decided March 17, 1902.

This case is governed by *Reloj Cattle Company* v. *United States*, just decided.

The grant was a grant by quantity, and the lawful area was south of the international boundary line, and had been set off to the owners by Mexico.

The right to acquire *demasias* or overplus was not a vested right, and where the conditions were unfulfilled in accordance with the terms of the grant at the time of the cession, claims to *demasias* cannot be confirmed.

THIS was a petition filed February 28, 1893, by Ainsa, as administrator, against the United States and one Whitney, for confirmation of the Agua Prieta grant, so called, which he represented he owned by virtue of "a grant title," dated De-

cember 28, 1836, made by the Mexican Republic under article eleven of decree No. 70, of August 4, 1824, and a law of the States of Sonora and Sinaloa, No. 30, of May 20, 1825, and other decrees, embodied in sections 3, 4, 5, 6 and 7 of chapter 9 of the organic law of the treasury, No. 26, of July 2, 1834; and that regular and lawful proceedings were had under those laws, by which the Mexican government, December 28, 1836, sold and conveyed the land to Juan, Rafael and Ignacio Elias Gonzales in consideration of $142.50 and other valuable considerations. The proceedings were set out at length in the petition.

The United States answered, denying the ownership and possession of the petitioner, and alleging that the grant by the State of Sonora was void; that the grant was located within the Republic of México; that it was confirmed in 1882 to Camou brothers by the Mexican government, and lay south of the boundary line; that the *demasias* of the grant was also confirmed to Camou brothers; and that a large area remained between the north boundary of the grant and of the *demasias* and the boundary line, which had since been purchased from Mexico by Camou brothers. February 14, 1899, on which day the cause came on for trial, petitioner filed an amended and supplemental petition, averring " that prior to the treaty known as the Gadsden treaty no resurvey of said grant had ever been applied for or ordered by any one, and that neither the grantees nor their successors in interest had, prior to said treaty, any knowledge or notice that within the said monuments there was an excess of land over the area stated in said title papers, and petitioner avers that the grantees under said grant were, under the laws of Mexico and the State of Sonora existing at the date of said treaty, and for a long time prior thereto had been, holders in good faith of any such excess or surplus, if any such there is, and entitled to occupy and retain the same as their own, even after such overplus is shown, without other obligation than to pay for the excess according to the quality of the land and the price that governed when it was surveyed and appraised; and petitioner further avers that if this honorable court should decide that said sale, as recited in said title papers did not, as petitioner avers it did, convey to the grantees

therein all of the said tract of land to the monuments described in said title papers without further payment therefor, he. is ready and willing and now offers to pay to the United States of America any amount that may be found to be due from him for such overplus, and also the costs for ascertaining the same, as soon as the amount of the same and the sum. due therefor is ascertained."

Petitioner tendered the sum of $600 in gold in payment of the. overplus and $200 in gold for costs, offered to pay whatever might be adjudged due, and prayed " that upon said payment this honorable court decree that petitioner is entitled to and is the owner of all of said tract of land, as originally surveyed, including said overplus or surplus, and that by said decree he be secured in the possession and ownership of the whole of said tract," etc.

The area delineated on petitioner's maps, as included in the grant claimed, was 163,797.48 acres. The Court of Private Land Claims rejected the claim, and dismissed the petition.

The documents covered three tracts of land called, respectively, Agua Prieta, Naidenibacachi, and Santa Barbara. And it appeared that on July 21, 1831, Juan, Rafael and Ignacio Elias Gonzales petitioned the treasurer general of Sonora, stating that they had cattle and sheep whose numbers they could not feed on the sitios belonging to them, for which reason the stock wandered to the four points of the compass, more particularly toward the waters of the Santa Barbara, Naidenibacachi, Agua Prieta, and Coaguyona, by which they suffered incalculable damage.

They therefore made denouncement of the lands that might be " found to be public lands within the points and waters aforesaid, which are bounded on the north by the Chiricahua Mountains, on the south by the lands of the Sinaloas, on the east by the mountains of Coaguyona, and on the west by the lands of the Saus ; " and petitioned that, under the law of May 20, 1825, the denouncement might be admitted, and orders issued for the survey, appraisement, publications, sale and other necessary proceedings. The petition was referred, testimony taken and report made as to the necessities of the case, and in October, 1831, at Hermosillo, Treasurer General Mendoza appointed Joaquin

Vincènte Elias, resident of San Ignacio, to proceed to take the legal steps, to "the survey of the said public lands," effecting the measurement, appraisement and publications as is provided, in the decrees No. 30, of May 20, 1825, and No. 175, of November 20, 1830, etc. In August, 1835, Elias proceeded to execute the commission, and on September 28 appointed and qualified his assistant measurers and recorders, and commenced the survey of the Agua Prieta tract. He asked "the attorney of Messrs. Elias to point out the place they wanted as the center; he did so, fixing a lagoon or pool that is in the middle of a valley called by the same name as the place and the center of all the circumference." The survey then followed and is given at length, and closed as to the Agua Prieta tract thus: "The survey being in this manner concluded, and containing in its area, the calculation having been made with entire correctness, six and one half short sitios, the party, who assented to what had been done, was cautioned to inform his parties in due time to have monuments of stone and mortar constructed, as is provided." Then came the survey of the Santa Barbara and Naidenibacachi tracts, and they were found to contain an area of "eleven and one half sitios and twelve and one half caballerias," which made, with the six and one half sitios, a total of eighteen sitios and twelve and one half caballerias. Appraisers were then designated, and the six and one half sitios composing the survey of Agua Prieta, were valued, one at sixty dollars, as it had a limited water course, and the others at fifteen dollars each, as they were absolutely dry, and the eleven and one half sitios and twelve and one half caballerias were appraised, one at eighty dollars, another at sixty, and the rest at fifteen dollars, making a total of four hundred and thirty-two dollars and fifty cents. Thereupon the lands were published for thirty consecutive days at the values fixed, from June 4 until July 3, 1836. The advertisement exposed for sale eighteen sitios and twelve and one half caballerias for raising cattle, comprised in the places of Agua Prieta, Naidenibacachi and Santa Barbara, surveyed in favor of the citizens Elias, and appraised in the sum of four hundred and thirty-two dollars and four reals. Three public auctions were then ordered and had on September 15, 16, 17, 1836. The advertisement was as follows:

" There are going to be sold on account of the public treasury of the department eighteen sitios and twelve and one half caballerias of land for the. raising of cattle and horses, comprised in the places called Agua Prieta, Naidenibacachi, and Santa Barbara, situate in the jurisdiction of the presidio of Fronteras, in the district of this capital, surveyed at the request of the citizens Juan, Rafael, and Ignacio Elias Gonzales, of this town, and appraised in the sum of four hundred and thirty-two dollars and four reals, as follows : The six and one half sitios, which compose the survey of Agua Prieta, one in the sum of sixty dollars, on account of having a small spring, and the other five and one half at the rate of fifteen dollars each, on account of their being absolutely dry ; and the other eleven and one half sitios, together with the twelve and one half caballerias, of which the other two places consist, one in the sum of eighty dollars, one in the sum of sixty dollars, and the others at fifteen dollars each, all of which sums together go to make up the total amount of four hundred and thirty-two dollars and four reals."

The property was sold to the Messrs. Elias at four hundred and thirty-two dollars and four reals, the record stating : " On these terms this act was concluded, the said eighteen sitios and twelve and one half caballerias of land which compose the said places of Agua Prieta, Naidenibacachi and Santa Barbara, situate in the jurisdiction of the presidio of Fronteras, having been publicly and solemnly sold to these interested parties for the said sum of four hundred and thirty-two dollars and fifty .cents, at which said lands had been appraised."   September 27, the treasurer general directed the parties to be notified to pay the sum in question into the treasury.   The title was issued, December 28, 1836, declaring that the purchase money for said " eighteen sitios and twelve and a half caballerias of land for breeding cattle and horses, which are comprised in the places called Naidenibacachi, Agua Prieta and Santa Barbara " had been paid, and granting in the. usual terms, the said eighteen sitios and twelve and one half caballerias contained in those places.

On the trial, Ainsa, administrator, introduced in evidence a

number of deeds made by descendants of the original grantees to Ainsa's intestate, ranging in date from December 24, 1886, to January 24, 1893.

The United States introduced a deed of the Eliases, dated July 25, 1862, conveying to the Messrs. Camou of Hermosillo, Mexico, by way of conditional sale, all of the property forming the subject matter of this suit, and also certain proceedings of March 17, 1869, and of November 15, 1880, showing the extinguishment of the equity of redemption.

May 31, 1899, petitioner asked for an order making Eduardo Camou party defendant, and presented a deed from Juan Pedro Camou to said Eduardo, quitclaiming the grantor's interest in the Agua Prieta grant, north of the international boundary line.

In addition to the documents much oral evidence in reference to the surveys was adduced on both sides.

The government introduced a certified copy of the expediente of the denouncement of the *demasias* of the grant made by Camou brothers before the Mexican tribunals by proceedings initiated April 22, 1880. The lands mentioned were the three places of Agua Prieta, Santa Barbara and Naidenibacachi, and four others. The denouncement was admitted by the district judge of Guaymas, May 31, 1880, and a resurvey ordered of the seven tracts, with direction that special care be taken to make the survey of each of the lands separately, and to designate in the minutes of the survey and on the several maps the *demasias* pertaining to each. The parties in interest were summoned and were satisfied with the survey made. In 1887 Plutarco Elias, for himself and his mother and brothers, brought an adverse suit against the denouncement on the theory that the Eliases, though not entitled to the *cabida legal*, were entitled to the *demasias*, but the contention was rejected. The value of the overplus was fixed, and the judge decreed that the owner was entitled under article 5 of the law of public lands, the law of July 22, 1863, to a reduction of one half the price as fixed, and it was so liquidated. The final result was the issue, January 30, 1888, of the title to the *demasias* in favor of Camou. The government also introduced in evidence the ex-

pediente of denouncement of a tract of public land amounting to 16,920 acres, situated between the north boundary of the Agua Prieta grant and the international boundary line. This proceeding was initiated May 4, 1881; the denouncement was admitted and a surveyor appointed, who issued summons to Elias, owner of the ranch of San Pedro, to Camou, owner of the ranches of Agua Prieta and Naidenibacachi, and to Ainsa, representing the lands surveyed to one Rochin, situated east of the Agua Prieta tract. A survey was had and the tract surveyed divided among the three petitioners, Mr. Camou, the owner of the Agua Prieta grant, acting as attorney in fact, giving his receipt for the three titles to the property, and describing it as public land. The government also put in evidence the withdrawal by Mr. Camou from the consideration of the surveyor general of Arizona of the grant now in controversy in July, 1880.

*Mr. Frank J. Heney* for appellants. *Mr. Rochester Ford* filed a brief for same.

*Mr. Matthew G. Reynolds* for appellees. *Mr. Solicitor General* and *Mr. William II. Pope* were on his brief.

Mr. CHIEF JUSTICE FULLER, after stating the case, delivered the opinion of the court.

The amount that passed to the grantee was six and one half short sitios, or about 28,200 acres, and the court below properly held that the case was controlled by the decisions of this court in *Ainsa* v. *United States*, 161 U. S. 208, and subsequent cases. It is contended that because a general description by natural objects was given in the original petition this was not a grant by quantity; but the proceedings leave no doubt that that was nothing more than the designation of the particular territory wherein the quantity purchased was to be located. The measurement of the tract was made with great care and the quantity repeatedly recited. Eighteen sitios and twelve and one half caballerias of land at the three places named were appraised,

sold, purchased, paid for, and granted, and no more. The survey of the Agua Prieta tract placed its contents at six and one half sitios, and of the other tracts, eleven and one half sitios, twelve and one half caballerias, which were separately appraised, and while the advertisement was of eighteen sitios and twelve and one half caballerias comprising the lands of the three places, the valuation of the six and one half sitios composing the Agua Prieta tract, and the valuation of the eleven and one half sitios, twelve and a half caballerias, were given separately, although all were sold, paid for, and granted together. The law then in force authorized the treasurer general to grant to old breeders, "who, from the abundance of their stock, need more," the quantity shown to be needed, but the minimum price was fixed by law, and before sale the land had to be surveyed, appraised and advertised, as was done. The Mexican government construed this grant on the denouncement of Camou as a grant by quantity, and the *cabida legal* was deducted and the *demasias* sold and patented by that government. That lawful area is south of the international boundary line and in Mexico; and as we have just said in the *Reloj Cattle Company* v. *United States*, there was no legal or equitable claim therefor existing against the United States when this petition was filed.

Assuming that some part of the entire claim lay in the United States, which is not conceded, petitioner on May 16, 1895, by an amended and supplemental petition, prayed the court to award the overplus to him on payment of such amount as might be found due.

The laws of Mexico and of the State of Sonora in respect of *demasias* treated excess over rightful titles as subject to the *jus disponendi* of the government. The possessor did not have title to the overplus, but might acquire it under the circumstances and in the way provided. A possessor does not mean owner. Escriche's Diccionario de Legislacion y Jurisprudencia. "Poseedor; Poseedor de buena fe; Poseedor de mala fe."

The second section of the Sonora law of May 12, 1835, No. 51, is given in *Ainsa* v. *United States*, 161 U. S. 226, though the words "pocedores de buena feé" should have been translated "possessors in good faith" rather than owners; and we there

said: " It thus appears that the resurvey of grants was provided for to ascertain the excess over the quantity intended to be granted, that unless the excess was more than half a sitio it might be disregarded, and that if it exceeded that, the owner of the original grant might be allowed to take it at the valuation. The application of Don José Elias was for a resurvey of the Casita in order that he might obtain the overplus lands therein on an appraisal, whereas if that ranch had been acquired by purchase *ad corpus,* that is to say, all the lands included by certain metes and bounds, possession delivered and monuments set up, it is not apparent how the necessity for having a resurvey could have existed; and so when in 1882 and 1886, the Mexican government was applied to by defendant Camou, under the law of July 22, 1863, his application proceeded upon the theory that the grant under consideration was a grant of a specific quantity within exterior limits, and what he sought and was accorded was an adjudication of the overplus on paying the value thereof ' in conformity with the tariff in force at the time of the denouncement.'

" Certain articles of the law of July 22, 1863, treat of the ascertainment and disposition of excesses where the indicated boundaries are supposed to cover only a certain quantity of land which, when resurveyed, turns out to be much larger than as described in the titles; and such resurveys had been practiced from an early day and were recognized by Don Elias himself in his application in respect of La Casita. Royal Decree, October 15, 1754, sec. 7, Reynolds' Span. & Mex. Land Law, 54; Law of July 11, 1834, chap. 9, sec. 3, Id. 187; Law of July 22, 1863, Hall's Mex. Law, 174."

If the excess did not exceed one half a sitio, it was disregarded. If it did, and the owner did not want it, or it was very great in the opinion of the government, it would be awarded to any one denouncing or soliciting it.

The second and third sections of the law of May 14, 1852, No. 197, were:

" 2. *Demasias* are considered to be those that may be found within the true out boundaries of the grant titles, and they shall be excessive when they amount to the third part of the land which said titles may contain.

"3. When the said *demasias* are not excessive, and the possessors apply for them with proof of having sufficient means for stocking them, they shall be adjudicated to them without public auction at the rates in force at the present time. If they should not want them, they shall be adjudicated to denouncers in like manner. Should they be excessive they shall be sold to the highest bidder."

Even when not excessive, the owner of the *cabida legal* was compelled to pay the rates in force at the time of the passage of the law, and by section eleven it was provided that they could not be secured without public auction unless the original expediente was presented to the treasury within one hundred days thereafter. When excessive, they had to be sold to the highest bidder. They were, in short, placed on the same footing as other public lands.

The United States is not subject to suit, except by its consent, and then only within the limits and on the terms prescribed. The act of 1891, in creating the Court of Private Land Claims, did not authorize that court to supervise performance of conditions unperformed, and by subsection eight of section thirteen it was provided that: "No concession, grant, or other authority to acquire land made upon any condition or requirement, either antecedent or subsequent, shall be admitted or confirmed unless it shall appear that every such condition and requirement was performed within the time and in the manner stated in any such concession, grant, or other authority to acquire land."

By section twelve, imperfect claims in respect of which no petition shall have been filed within two years, "shall be deemed and taken, in all courts and elsewhere, to be abandoned and shall be forever barred."

It is obvious that this contention cannot be sustained for the reasons indicated, and we repeat what we said in *Ely's* case, 171 U. S. 239: "This government promised to inviolably respect the property of Mexicans. That means the property as it then was, and does not imply any addition to it. The cession did not increase rights. That which was beyond challenge before remained so after. That which was subject to challenge before did not become a vested right after. No duty rests on this

government to recognize the validity of a grant to any area of greater extent than was recognized by the government of Mexico. If that government had a right, as we have seen in *Ainsa* v. *United States* it had, to compel payment for an overplus or resell such overplus to a third party, then this government is under no moral or legal obligations to consider such overplus as granted, but may justly and equitably treat the grant as limited to the area purchased and paid for."

*Decree affirmed.*