# UNITED STATES v. GREEN.
# CHRISTIE v. UNITED STATES.

## APPEALS FROM THE COURT OF PRIVATE LAND CLAIMS.

Nos. 109, 129. Argued January 27, 28, 1902. — Decided April 28, 1902.

The terms of the act of March 3, 1891, 26 Stat. 854, (establishing the Court of Private Land Claims), with reference to a proceeding like this, leave no room for doubt that it was the intent of Congress to require that, be-

fore a decision of the court in the premises, all those asserting claims in the land, adverse to the United States, should be made parties, and should be heard in support of their validity.

By the law in force at the time of the sale under consideration, a grant initiated in the manner in which the one in question is claimed to have been, could not exceed in the aggregate four sitios.

In its essential features this case is like *Ely's Administrator* v. *United States*, 171 U. S. 220.

It may be presumed that the Mexican officials duly performed the duty imposed upon them of registering the fact of the making of a grant of public lands.

In *Cameron* v. *United States*, 148 U. S. 301, the matter passed upon was not the same as that which is present in the case at bar.

THESE appeals concern the title to a tract of land situated in the county of Pima, Territory of Arizona. The litigation was begun by the filing in the Court of Private Land Claims, on February 27, 1893, on behalf of Alfred A. Green, of a petition by which the court was asked to declare the validity of the title of Green to the tract. It was alleged that Green had become invested with the title by mesne conveyances from one Ramon Romero and others, to whom the land had been granted on May 15, 1825, by the State of the West in the Republic of Mexico.

While the original documents constituting the grant were averred to be in the official custody of the surveyor general of the United States for the Territory of Arizona, it was alleged that the claim had not theretofore been considered or acted upon by Congress, or any other authority of the United States. A map was annexed to the petition, which it was asserted showed the boundaries of the land, and established that the quantity thereof was sixteen square leagues. Not only the United States, but also Colin Cameron, and others whom it was averred claimed some interest in the land, were made parties defendant to the cause.

The United States filed a general denial. Thereafter, on March 20, 1895, upon the application of the United States, Harvey L. Christie was made a party defendant, on the ground that he asserted title to the land under the grant to Romero.

On March 25, 1895, Colin Cameron filed an answer, in which he denied that petitioner had any interest in whole or in part

in the land, and it was also averred that he (Cameron) was the owner in fee simple, and that he was in possession of the tract, under the grant of May 15, 1825, referred to in the petition. The land claimed by Cameron was delineated on a map annexed to the answer, and the land was averred to be embraced within the original survey of the grant. The proceedings which it was claimed culminated in the grant were detailed at length. It was also alleged that as the result of proceedings instituted on February 28, 1880, by the successors in interest to the original grantees the surveyor general of the United States for the Territory of Arizona, on April 28, 1880, recommended the confirmation by Congress of said grant to the legal representatives of the original grantees to the extent of four square leagues, but that no action had been taken thereon by Congress.

Defendant also pleaded that on September 6, 1886, the United States, under the act of Congress approved February 25, 1885, entitled "An act to prevent unlawful occupancy of the public lands," brought suit against him for an alleged unlawful enclosure of public lands, a part of the tract in question, and that the trial court had adjudicated that the map attached to Cameron's answer in this case correctly represented the land included within the boundaries described in the original title papers of said grant, and that such map correctly represented the location of each monument called for and described in said title papers. Such findings of fact as to the monuments and location of the said grant were thereupon averred to be *res adjudicata* herein. The answer concluded as follows:

"Defendant further avers, in order to save every right belonging to him, that he in nowise invokes the jurisdiction of this court or submits himself to it voluntarily, and that he answers herein only because he has been made a party defendant. Defendant avers that he claims the lands of the said San Rafael de la Zanja grant under a title derived from the Mexican government that was complete and perfect when the United States acquired sovereignty over such lands; that all the steps and proceedings in the matter of the petition, survey, appraisement offers, auctions and sale of said grant and payment therefor were regular, complete and lawful, and vested a perfect and

valid title in fee thereto in the said grantees of said grant, and that said grantees at the time went into the actual possession, use and occupation of said grant and erected the proper monuments, and that said grantees and their descendants and legal representatives have continued ever since and until the present time in the actual possession, use and occupation of the same, and are now seized and possessed in fee thereof; that said grant document is a complete, definite grant in fee by way of sale, coupled with the condition subsequent not to abandon the same for a longer period than three years, without good reason, which abandonment would subject the tract to adjudication to third parties who might apply for or denounce the same; but that no forfeiture of said grant was ever claimed.

" Defendant avers that by reason of the premises he is in nowise bound by the act of Congress, establishing this court to apply to this court for a confirmation of said title, and that he is unwilling to submit himself to the conditions, or any of them, imposed by the act establishing this court, upon petitioners applying to said court for confirmation of their title, and that he does not by this answer, or in any other way, so apply."

On February 4, 1899, Cameron filed what was termed a " separate answer," in which were repeated the averments in the prior answer as to the petitioner not possessing any interest in the tract, the ownership thereof in the defendant, the proceedings which culminated in the grant to Romero, and the proceedings had before the surveyor general of Arizona. An averment was made that the map filed with the answer, as a part thereof, was a correct map of the grant in question, and showed the area of the grant to be 152,889.62 acres. It was next alleged that the grant to Romero was not a grant by quantity, but was a sale by metes and bounds and natural landmarks established by the Spanish survey, and that the grant vested in the grantees a true and valid title in fee to the whole of the surveyed land; and it was further alleged that each and every person in the occupancy of any portion of the tract was unlawfully occupying and that any patents issued by the Uni-

ted States for land within the grant were null and void. The answer next contained the following averments :

" Defendant further avers that prior to said treaty, known as the Gadsden treaty, no resurvey of said grant had ever been applied for or ordered by any one, and that none of the grantees or their successors in interest had prior to said treaty any knowledge or notice that within the said monuments there was any excess of land over the area stated in said title papers, and defendant avers that the grantees under said grant were, under the laws of Mexico and the State of Sonora existing at the date of said treaty, and for a long time prior thereto had been, holders in good faith of any such excess or surplus, if any such there is, and entitled to occupy and retain the same as owners even after such overplus is shown, without other obligations than to pay for the excess according to the quality of the land and the price that governed when it was surveyed and appraised ; and defendant further avers that if this honorable court should decide that said sale as recited in said title papers did not, as defendant avers it did, convey to the grantees therein all of the said tract of land to the monuments described in said title papers without further payment therefor, he is ready and willing and now offers to pay to the United States of America any amount that may be found to be due from him for such overplus, and also the costs for ascertaining the same, as soon as the amount of the same and the sum due therefor is ascertained."

The answer concluded with a tender of $1359 as payment for any overplus, and the further sum of $200 for the costs of ascertaining and determining the existence or non-existence of such overplus, and concluded with the prayer " that upon said payment this honorable court decree that defendant is entitled to and is the owner of all of said tract of land as originally surveyed, including said overplus or surplus, and that by said decree he be secured in the ownership and possession of the whole of said tract, and defendant, answering herein by reason of the fact that he has been made a party defendant, prays that the validity of his said title may be inquired into and decided, and that his title to all of said lands be declared valid, and that the said grant be adjudged to be and always to have been a com-

plete and perfect and unconditional title in fee, and the defendant be adjudged to be the owner in fee thereof, and for such other and further relief as to the court may seem meet and proper in the premises."

On February 4, 1899, an answer of defendant Christie was filed, in which it was averred that Christie was the owner of the land granted to Romero. In other respects the answer reiterated the allegations contained in the separate answer of Cameron just stated.

In a supplemental answer filed by leave on May 19, 1899, Cameron reiterated the plea of *res adjudicata* contained in his original answer.

From time to time various other defendants filed answers, setting up title by adverse possession, and otherwise to sundry portions of the land in controversy. The cause was heard on the theory that the pleadings of Cameron and Christie just referred to were cross complaints, demanding affirmative relief against the United States. On behalf of the two defendants named, there was introduced in evidence a certified copy of the expediente of the grant, as also the original titulo. This titulo shows the following as the original proceedings upon which the title was based:

On July 19, 1821, Don Manuel Bustillo, a resident of the presidio of Santa Cruz, applied to the intendant of the province of Sonora and Sinaloa, Antonio Codero, at Arispe, for four sitios of land at a place to which was afterwards given the name of San Rafael de la Zanja. Three of these sitios were to be north of and adjoining the lands of said presidio, and the other at the place called Cajoncito to the east. The application was granted on the same day without prejudice to third parties, and the commandant of Santa Cruz was ordered to make the survey, appraisement and publication of the land for thirty consecutive days in solicitation of bidders. Gonzales, the commandant of Santa Cruz, accepted the commission October 4, 1821, and ordered the survey to be commenced on the next day, after summoning the party in interest and the owners of coterminous lands. An assistant was appointed, and the survey made on October 5 and 6, 1821. After a waxed and twisted hempen

cord of fifty varas had been measured, the applicant (Bustillo) requested that, inasmuch as the place called Cajoncito was inside of the presidio lands, the one sitio he had asked for there be given to him in one tract with the other three, which request was granted. In substance it appeared that the survey was made by running or estimating the lines from the central point two hundred cords east, west, north and south, the ends of the lines being extended to form a square. The recitals of the survey concluded as follows:

"With which measurements was formed the square of the four sitios registered by Don Manuel Bustillo for raising cattle, and as such he accepted them; being informed that in due time he was to establish his boundaries with monuments of lime and rough stone as required by law."

Appraisers were appointed, and four sitios were appraised as follows: Three sitios at $60 each, because they had permanent water, and one sitio at $30, because it was dry. Publication was then made for thirty consecutive days, soliciting bidders. None appeared. Affidavits were taken to show that Bustillo was able to stock four sitios. The expediente was then forwarded to the intendant, who, in December, 1821, referred it to the attorney-general for his opinion. The latter official submitted a written opinion December 20, 1821, approving the proceedings, and recommending that the three usual public offers be made and the land sold to the highest bidder upon payment of the price and the usual fees. The intendant approved the recommendation, and ordered the three public offers made. The first offer was made January, 1822. The proclamation made by the crier, as recited in the account of the proceedings of the first auction, was as follows:

"There are going to be sold for this commission of auctions four sitios of public lands for cattle raising, comprised in the place named San Rafael de la Zanja, situated within the jurisdiction of the presidio of San Cruz, surveyed in favor of the one who denounced them, Don Manuel Bustillo, and appraised in the sum of two hundred and ten dollars, being at the rate of sixty dollars each for three of said sitios, and the remaining one at thirty dollars."

The bidders at the sale were Bustillo and one Romero. The latter, on behalf of himself and the residents of the presidio of Santa Cruz, became the purchasers for the sum of $1200. Romero was notified of the result, with which he expressed satisfaction, and asked the grant to be made. On January 11, 1822, the intendant *ad interim*, Ignacio de Bustamente, approved all the proceedings, and ordered Romero to be notified and to pay into the treasury the price of the land and the usual fees, and, as soon as that was done and a voucher for the payment was attached to the expediente, it be sent to the superior board of the treasury in Mexico for such action as it might see fit to take. Romero made the payment, and a certificate was given him for the amount thereof. At this point the proceedings were suspended, and so remained until May 15, 1825, when the recently created commissary general of the State of Sonora, Juan Miguel Riesgo, issued a title to "Don Ramon Romero and the other residents in interest," for "the four sitios of land for breeding cattle, comprising the place called San Rafael de la Zanja," under article 81, ordinance of intendants, and the royal instructions of October 15, 1754, at Fuerte, the then capital of the United States of Sonora and Sinaloa.

The following appears at the end of the titulo, viz: "Entry of this title is made at folio 3 of book No. 2 that exists in this commissariat general."

The expediente, which was on file in the archives of the State of Sonora, Mexico, at the city of Hermosillo, the capital, contained, following the certificate of the payments made by Romero, the following recital:

"The title on this expediente was issued on May 15, 1825, in favor of the interested parties, Don Ramon Romero and other residents of Santa Cruz. Rubricas E. R. Pa. 7 a. Notification. Vale."

The court found (two members dissenting) that a valid grant had been made, that the evidence established the central point of the original survey, and confirmation was made and decreed "of the said title of the said Ramon Romero, and of his co-owners and of their heirs, successors in interest, and assigns" to four sitios of the tract, measured in a square from the center

established by the Mexican surveyor, as shown on the map of a certain survey made in 1895, and in evidence in the cause. The claim of plaintiff and of defendants Cameron and Christie to all other land not so confirmed was rejected.

Appeals were prosecuted by the United States and by Cameron and Christie.

*Mr. John W. Griggs* and *Mr. Francis J. Henry* for appellants in No. 129, and appellees in No. 109.

*Mr. William H. Pope* and *Mr. Matthew G. Reynolds* for the United States. *Mr. Solicitor General* was on their brief.

*Mr. Rochester Ford* filed a brief for the United States and for Christie.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

We will first dispose of the questions presented by the appeal of the United States. In substance, it is asserted that the grant should have been rejected *in toto*, instead of being confirmed to the extent of four sitios, upon the following grounds : 1. That the claim was barred by section 12 of the act establishing the Court of Private Land Claims, because not asserted until after the expiration of two years from the passage of the act. True, it is said, the claim of Green was presented in time, but as he was not represented at the trial and Cameron and Christie were treated as the sole claimants and they had not by their cross complaints asked for affirmative relief within the statutory limitation, the bar of the statute was operative as to them. 2. The intendant *ad interim* Bustamente, through whom the sale to Romero and others purported to have been effected, and the commissary general of Sonora who ultimately extended the title, did not possess the power in the premises which they assumed to exercise ; 3. The grant in question was not duly located prior to September 25, 1853, as required by article VI of the Gadsden treaty ; 4. The grant was not duly recorded in the archives of Mexico prior to September 25, 1853, which was

made a condition precedent to the recognition of an alleged grant, by the article of the treaty just referred to.

As respects the bar of the statute, we think the contention is clearly without merit, even upon the hypothesis that the grant to Romero constituted, at the date of the treaty, but an imperfect title to the extent to which the court below confirmed the same. The provision of the act establishing the Court of Private Land Claims, relied upon, is as follows:

"Sec. 12. That all claims mentioned in section six of this act which are by the provisions of this act authorized to be prosecuted shall, at the end of two years from the taking effect of this act, if no petition in respect to the same shall have then been filed as hereinbefore provided, be deemed and taken, in all courts and elsewhere, to be abandoned, and shall be forever barred."

By the filing of the petition on behalf of Green the court below was vested with jurisdiction to determine the validity of the grant upon which the proceeding was based and to pass upon the question as to whether or not the lands embraced therein were at the date of the treaty public land of the United States. The terms of the act establishing the Court of Private Land Claims, with reference to a proceeding thus instituted, in our opinion leave no room for doubt that it was the intention of Congress to require that before a decision by the court in the premises, all those asserting claims in the land adverse to the United States, under the grant relied upon, should be made parties and be heard in support of its validity. The provisions of section six of the act, which relate to claims for confirmation of imperfect and incomplete titles, manifestly import that every adverse possessor or claimant should be made a party defendant, and the section prohibits the entry of a decree "otherwise than upon full legal proof and hearing." By section seven, "all proceedings subsequent to the filing of the petition" are required to "be conducted as near as may be according to the practice of the courts of equity of the United States;" and, in addition, it is provided as follows:

"The said court shall have full power and authority to hear and determine all questions arising in cases before it relative to

the title to the land the subject of such case, the extent, location and boundaries thereof, and other matters connected therewith fit and proper to be heard and determined, and by a final decree to settle and determine the question of the validity of the title, and the boundaries of the grant or claim presented for adjudication, according to the law of nations, the stipulations of the treaty concluded·between the United States and the Republic of Mexico, at the city of Guadalupe Hidalgo, on the second day of February, in the year of our Lord eighteen hundred and forty-eight, or the treaty concluded between the same powers at the city of Mexico on the thirtieth day of December, in the year of our Lord eighteen hundred and fifty-three, and the laws and ordinances of the government from which it is alleged to have been derived, and all other questions properly arising between the claimants or other parties in the case and the United States, which decree shall in all cases refer to the treaty, law· or ordinance under which such claim is confirmed or rejected."

The fact also that, by section 8, the United States may, without limitation as to time, voluntarily institute a proceeding for the determination of the validity or invalidity of any claim or title deemed by it "open to question," affords further support for the construction that Congress intended that in a proceeding brought in due time to settle the validity of an alleged Spanish or Mexican grant, the United States might, at any stage of such pending litigation, apply to the Court of Private Land Claims—as was done by the United States with respect to the defendant Christie — to have brought into the case adverse claimants who had not been made parties defendant by the petitioner, in order that such parties might be afforded an opportunity to be heard, and the Court of Private Land Claims be aided in reaching a just decision. As further establishing the fact that it was not the purpose of Congress to deprive the Court of Private Land Claims of power to adjudicate upon claims asserted by defendants during the pendency of a lawful proceeding to obtain an adjudication respecting the validity of an alleged Mexican grant, even though such defendants were made parties or filed claims for affirmative relief after the pe-

riod limited for the institution of an original proceeding to obtain confirmation of a claim of title, we excerpt the following proviso to the portion of section 12 heretofore quoted:.

"*Provided*, That in any case where it shall come to the knowledge of the court that minors, married women or persons *non compos mentis* are interested in any land claim or matter brought before the court, it shall be its duty to appoint a guardian *ad litem* for such persons under disability, and require a petition to be filed in their behalf, as in other cases, and if necessary to appoint counsel for the protection of their rights."

The second and third grounds relied upon by the Government, as above stated, to defeat the claim in its entirety do not require extended consideration, as they are foreclosed by recent decisions of this court. By the law in force at the time of the sale under consideration a grant initiated in the manner in which the one in question is claimed to have been, could not exceed, in the aggregate, four sitios. The evidence clearly showed that the quantity of land denounced, appraised, paid for and purported to have been granted was only four sitios. Under these circumstances, the court below properly sustained the grant to the extent of four sitios only. As said by the Court of Private Land Claims: "The cause is founded on a proceeding initiated in 1821 and concluded in 1825. In its essential features it is like *Ely's Administrator* v. *United States*, 171 U. S. 220. The proceedings under which the grant was made are precisely like those upon which the grant in that case was made, and were had under the same laws, and the two grants were made by the same officer." The case in the particular stated is, therefore, ruled by *Ely* v. *United States, supra; United States* v. *Maish*, 171 U. S. 277; *Perrin* v. *United States*, 171 U. S. 292; and *United States* v. *Camou*, and *Reloj Cattle Company* v. *United States*, 184 U. S. 624.

As from the evidence the Court of Private Land Claims was able to determine the true boundaries of the tract as limited, the cases just cited are also authority for deciding that the grant was duly located to that extent, and hence that the court rightfully confirmed the grant for the lawful extent thereof.

The remaining ground upon which the United States con-

tends that the claim should have been rejected, is that it was not established that a record of the grant was made. As respects the evidence of a due recording of the grant, the case at bar is similar to the *Ely* case, *supra*, where, however, no question was raised by the Government as to the want of a proper record. In the Sonoita grant, passed on in the *Ely* case, the final title was issued on the same day on which the final title in the case at bar purports to have been issued, and contained a like notation that "note of this title is taken on page 3 of book No. 2 in this general commissariat." A memorandum of this character appears to have been customarily endorsed on the titulo.

The evidence in the case at bar showed that there are only two books of Toma de Razon in the records at the capital of the State of Sonora, Mexico. One book has the figure 1 written on the first page of the first leaf, and contains entries of grants up to and including May 13, 1825. The first entry on the other book bears date of 1831. In the case at bar the final title or titulo, of date prior to the regulations of 1828, was admitted in evidence without objection or question as to its genuineness, nor was any objection interposed by the Government to the introduction in evidence of a letter, dated some time in 1831, written by the provincial secretary of Sonora, on behalf of the commissariat general of that State, alluding to the existence of the title to this San Rafael grant. The expediente is also on file in the Mexican archives, and contains thereon a memorandum of the issue of a grant. In view of all these circumstances it may properly be presumed that the ministerial duty which it is claimed was imposed on the Mexican officials of registering the fact of the making of a grant of public lands was duly performed, and that such record was in fact made. Whether, as held by the court below, the mere retention in the Mexican archives of the expediente constituted the record of the grant, within the meaning of the treaty of 1853, need not be determined.

We come then to consider the contentions relied upon by the claimants to sustain their appeals. Those contentions are in substance that the grant to Romero and his associates consti-

tuted a complete and perfect title to the full quantity of land embraced within the original survey, which it was asserted by witnesses for the claimants aggregated not merely four sitios, but nearly one hundred and sixty thousand acres of land. It is manifest however, from the authorities which we have previously cited, that as the grant was lawful to the extent of only four sitios, the claimants cannot be heard successfully to assert that it embraced and could be confirmed for the larger quantity.

The previous decisions of this court also preclude the claim for a confirmation of the grant as to the overplus upon payment of the asserted value of such excess. In *Ainsa* v. *United States,* 184 U. S. 639, decided at this term, discussing the contention of the claimant that he was entitled to an award of the demasias or overplus beyond the cabida legal or real quantity granted, upon payments of such amount as might be found due, the court concluded as follows:

"It is obvious that this contention cannot be sustained for the reasons indicated, and we repeat what we said in *Ely's* case, 171 U. S. 239: 'This government promised to inviolably respect the property of Mexicans. That means the property as it then was, and does not imply any addition to it. The cession did not increase rights. That which was beyond challenge before remained so after. That which was subject to challenge before did not become a vested right after. No duty rests on this government to recognize the validity of a grant to any area of greater extent than was recognized by the government of Mexico. If that government had a right, as we have seen in *Ainsa* v. *United States* it had, to compel payment for an overplus or resell such overplus to a third party, then this government is under no moral or legal obligations to consider such overplus as granted; but may justly and equitably treat the grant as limited to the area purchased and paid for.'"

Counsel for claimants in their brief call attention to the plea of *res adjudicata* interposed by the claimant Cameron, though they do not discuss the same. The action in which the judgment thus pleaded was rendered related to land within the asserted exterior bounds of the grant, near the alleged north and northeast monuments, as said boundaries were recited and

measured in the expediente.  The courts of the Territory had
held that the lands enclosed were public lands of the United
States, that Cameron had unlawfully enclosed the same, and
the removal of the fence enclosing the land was ordered.  On
appeal, however, this court, while expressly disclaiming any in-
tention to pass upon the validity of the asserted title of Cam-
eron, held that there was color of title sufficient to take the
case outside of the operation of the statute, reversed the judg-
ment against Cameron, and remanded the case with directions
to dismiss the petition.  148 U. S. 301.  It is clear that, irre-
spective of the question of parties, the matter passed upon in
the fence case was not the same as that which is present in the
case at bar.  The fence case did not involve, as does the case
at bar, the question whether or not the claimant had a valid
title to land within the boundaries of the alleged grant, and
hence nothing decided in that case was conclusive in this.

*Decree affirmed.*